**DOUGLAS HOMS CO. and Arthur J. Fritz & Co.**

v.

**UNITED STATES.**

C.D. 3868; Protest 66/5–107514.

United States Customs Court, Second Division.

July 17, 1969.

Glad & Tuttle, San Francisco, Cal. (George R. Tuttle, Jr., San Francisco, Cal. of counsel), for plaintiffs.

William D. Ruckelshaus, Asst. Atty. Gen. (Arthur H. Steinberg, New York City, trial attorney), for defendant.

Before RAO and FORD, Judges.

FORD, Judge:

This case brings before the court for determination two separate and distinct matters. Plaintiffs herein originally filed a timely protest against the decision of the collector of customs at San Francisco, California. In this protest, plaintiffs claim the assessment of duty under the Tariff Schedules of the United States was illegal on the theory that any increase in the rates of duty was unauthorized. Counsel for plaintiffs, at the trial, orally moved to amend the protest. The trial judge, on circuit, reserved the ruling for the division and permitted the parties to proceed on the merits. The first matter, therefore, involves the propriety of amending the protest. The second matter involves the merits of the case, to wit, whether certain imported scales are properly subject to duty at 18 per centum ad valorem under item 662.30, Tariff Schedules of the United States as classified or at only 10 per centum ad valorem under item 662.26, as claimed by the amendment.

An adverse determination of the first matter would result in a dismissal of the protest since the original claim is not pressed and is, therefore, deemed abandoned. Under the circumstances, it is necessary to first consider plaintiffs' motion to amend. The pertinent portions of the provisions governing amendment read as follows:

28 U.S.C. § 2642. Amendment of protests, appeals and pleadings.

The Customs Court under its rules and in its discretion may permit

amendment of protests, appeals for reappraisement, applications for review, petitions for remission and pleadings.

Rules of the United States Customs Court

Rule 6(c) Amendment of pleadings. —A party may amend his protest, petition, appeal, application for review, or other pleadings or process, at any time by leave of court, and such leave shall be freely given when justice so requires.

Prior to the Tariff Act of 1922, amendments to protests were not permitted on the ground that claims other than those originally contained in the protest constituted separate and distinct causes of action. Under this theory, any amendment made after the statute of limitations had run would be untimely. Davies v. Arthur, 96 U.S. 148, 24 L.Ed. 758 (1877); Arthur v. Morgan, 112 U.S. 495, 5 S.Ct. 241, 28 L.Ed. 825 (1884). However, section 514, Tariff Act of 1922, provided that protests may be amended any time prior to first docket call under such rules as the Board of General Appraisers (now the United States Customs Court) might prescribe. Subsequently under the Tariff Act of 1930 and specifically section 518, Congress again granted permission to this court to permit in its discretion and under such rules as it may prescribe amendments of protests. This provision is presently contained in 28 U.S.C. section 2642, *supra*.

Pursuant to this provision of law this court has provided for amendments to protests in Rule 6(c) which reads as set forth, *supra*.

It is, therefore, apparent that since 1922 the importer may in the discretion of the court and under its rules amend his protest. By judicial decision certain other limiting factors were imposed upon the amendment. Defendant contends the protest filed herein does not contest the classification but only the increase in rate is challenged. The language of the protest is as follows:

We claim the merchandise dutiable at the appropriate rate under the provisions of the Tariff Schedules of the United States; that any increase in rate was not authorized by the Congress of the United States and is illegal, null and void; and that the merchandise is properly dutiable at the rates in effect on August 30, 1963.

Based upon this protest, defendant contends the amendment is really a substitute protest since the collector had no opportunity to review the claims now contended. A basically similar situation was involved in William Goodacre & Sons, Ltd., et al. v. United States, 5 Cust. Ct. 82, C.D. 374 (1940). In that case, a general form of protest claimed a 20 percent reduction on all the merchandise covered by said protest by virtue of a trade agreement with Cuba, T.D. 47232. The amendments involved in that case brought a classification question before the court rather than the 20 percent reduction. The court permitted the amendments following the decision in United States v. Macksoud Importing Co. et al., 25 CCPA 44, T.D. 49041 (1937).

In the *Macksoud* case, *supra,* the opposite situation arose wherein a protest contesting the classification was amended to claim an improper conversion rate. The court therein made the following observation with respect to the right to amend protests after having first reviewed the historical background.

Section 518 of the Tariff Act of 1930 specifically provides that the United States Customs Court may, in its discretion and under such rules as it may prescribe, permit amendments to protests. It is obvious that it was the purpose of the Congress to permit such amendments only after the collector had lost, and the Customs Court had obtained, jurisdiction of such protests. Therefore, the Congress could not have contemplated that the averments contained in such amendments would aid the collector in reviewing his decision, or that the matter contained in such averments

was in the mind of the protestant at the time the original protest was filed.

It certainly was not the purpose of the Congress to limit the operation of the quoted provisions of section 518, *supra*, to amendments for corrections of defects in form only, because, under the statute of *jeofails*—section 954 of the Revised Statutes (sec. 777, title 28, U.S.C.)—the United States Customs Court already had authority to correct "any defect or want of form" in pleadings, and in processes issued by it. United States v. Bracher & Co. et al., 13 Ct.Cust. Appls. 432, 437, T.D. 41344. See also United States v. Monsanto Chemical Works, 21 C.C.P.A. (Customs) 33, 39, T.D. 46377. Nor do we believe that it was the intention of the Congress to limit amendments to statements of fact which merely amplify claims contained in protests, because, under the law, claims made in protests must be sufficiently definite and specific to inform the collector of the objections to his decision.

\* \* \* \* \* \*

Why, then, should the Congress provide for amendments to protests, after the United States Customs Court has obtained jurisdiction, un-

less it was its purpose to give that court the power, in its discretion and under such rules as it might prescribe, to permit, by such amendments, the presentation of new and additional claims, which might have been made in the original protest *as to the merchandise covered by that protest?* We think that that was the purpose of the Congress, and that any other construction of the provisions in question would make them practically inoperable.

Accordingly, we are of opinion that claims permitted to be introduced by amendment were not intended by the Congress to be considered new and separate causes of action, which, under the decisions hereinbefore referred to, would be barred by the statute of limitations.

■ By virtue of the legislative background and following the cases cited, *supra*, which we deem controlling, we are of the opinion that plaintiffs' motion to amend does not constitute a new and separate cause of action, and said motion is accordingly granted.

Since the protest presently before this court now contests the classification, a consideration on the merits of the issue will be considered. The scales under consideration are as follows:

Plaintiffs' exhibit 1 Model 28    Maximum capacity 32 ounces.
Plaintiffs' exhibit 2 Model 5    Maximum capacity 5 pounds.
Plaintiffs' exhibit 3 Model 20    Maximum capacity 20 pounds.
Plaintiffs' exhibit 4 Model 64    Maximum capacity 60 pounds.

The statutory provisions involved herein provide as follows:

Tariff Schedules of the United States

662.26    Fully automatic weighing machinery requiring no manual operations for weight determinations, and accurate to $\frac{1}{20}$ of 1 percent or better of the maximum weighing capacity, on weight tests within the weighing range of the scale ..................... 10% ad val.

662.30    Other ................................ 18% ad val.

It is obvious from an examination of the exhibits and from the record that the imported merchandise falls within the purview of the language, "Fully automatic weighing machinery requiring no manual operations for weight determinations".

However, the accuracy required and whether the merchandise falls within the tolerance specified are in issue. The language involved in item 662.26 is new to the tariff laws of this country. Our research fails to disclose any case interpreting this provision. It is our primary purpose in interpreting the statutory provision to carry out the intent of Congress. The legislative history as contained in the Tariff Classification Study 1960, Schedule 6, part 4, gives the following explanations of item 662.26:

* * * The present tariff act contains no specific provisions for weighing machinery. As a result such articles are held to be dutiable under various provisions at various rates. Household or hospital scales are dutiable in paragraph 339 principally at the rate of 17 percent ad valorem. Other scales, if containing an essential electrical element, are classifiable under paragraph 353 at 13.75 percent ad valorem, or, if machines not containing an essential electrical element, under paragraph 372 at the rate of 11.5 percent ad valorem. Still other scales are dutiable in paragraph 397 at the rate of 19 percent ad valorem as manufactures of metal not specially provided for. This multiple classification of scales is confusing and unrealistic. As a result of information received in connection with the hearing, the provisions as published for hearing have been modified. * * * The final proposal, however, would provide the rate of 12.5 percent ad valorem (the approximate arithmetical average of the applicable rates in paragraphs 353 and 372) only for "fully automatic weighing machinery requiring no manual operations for weight determinations, and accurate to ½0 of one

percent or better of the maximum weighing capacity, on weight tests within the weighing range of the scale". Item 662.30 reflects the rate of 18 percent ad valorem which is an estimated weighted average of the rates currently applied in paragraphs 339 and 397. It is believed that these proposals substantially reflect the existing tariff treatment, but with a more meaningful distinction between the types of products.

The information received in connection with the hearings is contained in two letters of the Scale Manufacturers Association. The pertinent portion of the letter dated August 26, 1959, reads as follows:

This two-term classification for scales would, we believe, apply approximately the same rates of duty as are currently applied to the various types of scales and would furnish a rather easily applied criteria for placing imported scales into the proper classification. The first step is to distinguish the full automatic scale from those requiring manual operation to get a weight determination or reading. If the scale reflects automatically the weight of the object placed on the weighing platform, it falls under item 662.30, provided it has the required accuracy, or better. If the scale requires manual operation, such as the handling of weights or the moving of a beam poise, then it is not an automatic scale and falls under item 662.31, regardless of its stipulated accuracy.

Also, any scale with an error greater than that stipulated, at any test load applied within its weighing range, would fall under item 662.31. The value of the stipulated error is easily determined by taking one-twentieth of 1 percent of the maximum weighing capacity of the scale; in other words, one-twentieth of 1 percent of the largest total weight which the scale will measure. Usually the accuracy can be determined from the manufacturers' statements or literature, as

it is significant in selling scales. Spot tests of particular models will readily show the correctness of the accuracy claims.

This is similar to normal tests of such scales in this country, to ascertain if they meet the weights and measures requirements of the States and cities for commercially used buying and selling scales. The permitted errors for such scales are spelled out in National Bureau of Standards Handbook 44, but have been increased somewhat under item 662.30 in order to simplify the determination of the stipulated error; that is, to relate it to the easily determined maximum weighing capacity. The application of this accuracy criteria is the simplest means of restricting proposed item 662.30 to the fine, automatic, well-designed, accurate, and reliable scales which have traditionally been permitted to enter as machinery under 1930 paragraph 372, and under paragraph 353.

The National Bureau of Standards Handbook 44 referred to above, pertaining to errors, also appears to be contained in National Bureau of Standards Handbook 94. The handbook, while referring to scale accuracy and tolerance, does not spell out what exact tolerances are permitted. However, since the 1/20 of 1 percent tolerance is in the statutory language, this is what we must consider in determining whether the imported scales fall within the purview of said item. Handbook 94 sets forth the following information relative to tolerance:

*Application of Tolerances.* Depending upon the character of results desired, testing may be either "tolerance testing" or "error testing." Tolerance testing is used when it is desired to know only whether or not the errors on the device under examination are within tolerance; this is the sort of testing that the weights and measures official is most frequently called upon to perform. If, however, in a particular case, it is desired to know the value of the error at each point observed, and not merely that the error does not exceed the tolerance, then error testing is resorted to.

*Tolerance Testing.* In tolerance testing, a known load is applied on the load-receiving element of the scale and this load is opposed by a weighbeam poise set to a corresponding value, by the theoretically correct amount of standard weights on the counterpoise hanger, by standard weights on the opposing pan, by the automatically-applied counterforce of the automatic-indicating scale, and so on; if the scale is now found to be in error, the full value of the tolerance is at once applied —as for example, by adding weight on the load-receiving element if the scale is underregistering or by removing weight from the load-receiving element or adding weight on the counterpoise hanger if the scale is overregistering. Having made a change equivalent to the value of the tolerance, if this change is more than sufficient to overcome the error, the scale error is less than the tolerance; if this change is just sufficient to overcome the error, the error is just within tolerance; if this change is not sufficient to overcome the error, the scale is out of tolerance at that point. In either of the first two cases mentioned, the scale is "accurate" because it is within tolerance, and the inspector proceeds at once to his next observation without using time to determine just how large the error may be.

In addition to the foregoing said handbook under procedure for automatic indicating scale tests states the following:

3.2 Increasing-load test—at least at each quarter of reading-face capacity.

3.3 Decreasing-load test—use half-capacity load.

Based upon the foregoing and the statutory language, a scale is deemed accurate if it registers within the tolerance provided for. Counsel have stipulated the

tolerance of ½₀ of 1 percent for each of the exhibits as follows:

Exhibit 1 — .016 ounces
Exhibit 2 — .04 "
Exhibit 3 — .16 "
Exhibit 4 — .48 "

By virtue of the calibration of the dial it is apparent that it would be impossible to accurately read within the tolerances since exhibit 1 is calibrated in ⅛ of an ounce, exhibit 2 has ½ of an ounce graduation, exhibit 3 has 1 ounce graduation and exhibit 4 has graduation of 4 ounces.

The testimony of Mr. Homs indicates that his company customarily tests scales such as exhibits 1–4 at intervals of ¼ scale capacity, i. e., ¼, ½, ¾, and full capacity. He uses standard weights which are periodically checked by the Department of Weights and Measures. The witness was of the opinion that scales of the type under consideration, which are imported by him, are accurate within the prescribed tolerances. At the trial, the witness produced a test weight of 1 pound and tested exhibits 1 and 2. Exhibit 1 registered 1 pound while the pointer on exhibit 2 was a hairline above the 1 pound mark. This was within the accuracy required of a scale of this kind, in the opinion of the witness. A 5 pound weight was placed on exhibit 3 and the record indicates the pointer was partially on and partially off the 5 pound mark. This, the witness testified, was for all practical purposes an accurate reading. Exhibit 4 had the 5 pound weight placed upon it and the pointer bisected the 5 pound reading. A weight stipulated to be ½₂ of an ounce was placed on exhibit 1 and was read by Mr. Homs as ¹⁄₁₆ of an ounce. The witness testified that since the graduations are in ⅛ of an ounce he had to assume the weight of ¹⁄₁₆ of an ounce and upon rereading, it could be ½₂ of an ounce.

Defendant's position relative to the accuracy is based upon the fact that the weights used by the witness had not been verified as being the weight indicated. Defendant also contends there is a lack of proof that the scales at bar fell within the tolerance permitted by item 662.26.

We are of the opinion that Congress in enacting a provision for accuracy of ½₀ of 1 percent did not intend to do a useless act. Fensterer & Voss (Inc.) v. United States, 12 Ct.Cust.Appls. 105, T.D. 40029 (1924). It is clear from the quoted material of the Bureau of Standards that there are methods for determining whether a scale falls within the tolerance required. The addition or subtraction of weights is at least one prescribed method. There are undoubtedly other methods prescribed by local weights and measures authorities for determining whether a scale falls within a specific tolerance. The testimony that exhibit 2 registered a "hairline" above and that exhibit 3 indicated a weight partially on and partially off the black 5 pound mark is not sufficient to bring the scales within the tolerance allowance. How much is a hairline? When we are considering tolerances which run from 0.016 to 0.48 ounces, a hairline might well be more than the prescribed tolerance. Unless sufficient evidence is adduced which would affirmatively establish the scales to be within the tolerance prescribed by Congress, plaintiff must fail. The protest is accordingly overruled.

Judgment will be entered accordingly.

RAO, C. J., concurs.